## Brown & Vaughn Development Company *v.* Commonwealth, Appellant.

Argued May 26, 1958. Before JONES, C. J., BELL, MUSMANNO, ARNOLD and JONES, JJ.

*Leonard M. Mendelson,* Assistant Attorney General, with him *Frank E. Roda,* Assistant Attorney General,

*John R. Rezzolla, Jr.,* Chief Counsel, Department of Highways, and *Thomas D. McBride,* Attorney General, for appellant.

*Henry E. Rea, Jr.,* with him *Paul W. Brandt,* and *Brandt, Riester, Brandt & Malone,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, July 25, 1958:

The power of eminent domain is one of the most awesome as well as arbitrary rights of government. By it the State may take a citizen's property, whether or not he approves of the taking. However, the citizen has a right equally as awesome and that is, his government must pay him the value of the property taken. What represents that value sometimes develops into a legal controversy. It has so developed here.

In extending McKnight Road, a fine 80-foot boulevard carrying traffic from Pittsburgh into the beautiful North Hills area of Allegheny County, the Commonwealth found it necessary to condemn certain property belonging to Brown & Vaughn Development Company, because the course of the highway was cast through the very holdings of Brown & Vaughn. This company owned a 92.16-acre tract which it had laid out in lots for homes. In preparing the residential site, which it called Longvue Acres Plan No. 9, it levelled ground, cut, graded and paved roads, installed sewers and dug foundations for homes. In fact, by the time the Commonwealth appeared on the scene ready to plough through the very center of Longvue with bulldozers, the company had built 17 homes and was in the process of constructing 45 more. The bulldozer invasion meant the outright taking of 4.80 acres and the isolating mutilation of 9.21 acres more.

A Board of Viewers appointed to evaluate the plaintiff's loss awarded damages in the sum of $20,000. The Commonwealth appealed to the Court of Common Pleas

where a petit jury assessed the damages (together with detention money) to be $57,800. The Court reduced the verdict to $47,800, which reduction was accepted by the plaintiff. The Commonwealth of Pennsylvania appealed, asking for a new trial, assigning various reasons which we will consider seriatim.

In his opening address to the jury, plaintiff's counsel made the assertion that it was the Commonwealth which was dissatisfied with the award of the Board of Viewers and had taken the appeal to the Court of Common Pleas. Commonwealth's counsel objected and moved for the withdrawal of a juror. The Trial Judge instructed the jury to disregard the remark and explained that it did not matter which party appealed to the Court of Common Pleas: "Ladies and gentlemen, in a case of this character much of what counsel outlined is correct. However, it makes no difference who files a petition to have viewers appointed or who takes an appeal. Frequently they both take appeals. The Board of Viewers is an agency of the Court, an instrumentality of the Court; they do the preliminary work to help the Court along."

At the termination of the taking of testimony in the case the Trial Judge made the same error committed by plaintiff's counsel by stating: "This is an appeal by the defendant from an award by the Board of Viewers." When this was called to his attention, he admitted the mistake and instructed the jury: "I did say that, but it does not make any difference who takes the appeal. Frequently both do it. They have a right to have a jury decide it. Nobody knows what occurred before the Board of Viewers. You have no right to consider that. This is a trial as if it had never been tried before."

While not approving of the reference to the identity of the appellant before the Court of Common Pleas, we

are satisfied that the Judge's original remarks in no way prejudiced the Commonwealth. He made no reference to the amount of the award and there was nothing specific said about the nature of the Commonwealth's dissatisfaction. His explanation wiped away any untoward impression left by the first statement.

Commonwealth's counsel, however, in their appeal, still insist that the reference to the Board of Viewers proceedings constituted basic error, which entitles them to a new trial. On this point they lean heavily on the case of *Fisher v. Dela. L. & W. R.R. Co.*, 227 Pa. 635. While that case is a sturdy oak of authority in the field over which it throws its protective shade, it can serve in this case only as a twig of relevancy. In the *Fisher* case, counsel for the plaintiff specifically mentioned to the jury the amount of the award rendered by the Board of Viewers. In the case at bar, there was not the slightest shadow of an intimation as to the nature of the award of the Board of Viewers. We are satisfied from a reading of the record that the lower Court did not abuse its discretion in refusing to withdraw a juror or grant a new trial because of the reference made by plaintiff's counsel and by the Court itself.[1]

The Commonwealth contends that the Trial Judge told the jury to ignore the testimony produced by its experts as to the value of the plaintiff's property before and after the taking. In support of this argument, Commonwealth's counsel in their brief quote various excerpts taken from the Judge's charge to the jury. Several of those excerpts read: "You have a right to reject, in toto, the opinion of an expert witness you may disbelieve, whether it is contradicted or not—and they are contradicted in this case—and supply your own good common sense and horse sense." . . . "I know

---

[1] *Black v. Troutman Co.*, 385 Pa. 138.

every one of you has the common sense to determine what the fair market would have been. That is the test that represents fair market value." . . . "You have heard all the expert witnesses; and by your good, sound, common sense I am sure you will arrive at a verdict that is just."

Taking disconnected fragments of a Court's charge and considering them unrelated to context is like cutting up a painting and then pasting the pieces together on a new theme. By this process, *Washington Crossing the Delaware* may be made to look like *Custer's Last Stand*. The Trial Judge did tell the jury to use their common sense in determining the fair market value of the property under consideration but he also told them: "We must use expert testimony; that is the only way we can prove this case because we must rely exclusively on the testimony of expert witnesses."

It is true that the Trial Judge at times in his charge placed something less glorious than laurel wreaths on the heads of expert witnesses. It is true he did say: "If I were to give my interpretation of an expert witness, you wouldn't like it and the lawyers wouldn't like it,—" But he followed this immediately with the statement—"but both sides must use it."

Much has been said in the reports, in text books, and in legal dissertations on the asserted unreliability of expert testimony, especially in the field of real estate values. In this very case, the enormous disparity between the market values testified to by plaintiff's experts and those announced by the defendant's experts would seem to emphasize the poor opinion generally entertained on real estate experts. It may be noted that one plaintiff's expert testified that the plaintiff suffered damages in the sum of $64,400; another said the damages amounted to $72,700. The three experts called by the Commonwealth testified that the damages did

not exceed $8,000. Obviously, there is something seriously wrong here. The difference between $8,000 and $72,700 is too enormous to be regarded lightly. And yet, there is something to be said for expert testimony because, without such evidence, the jury would be called upon to give a sheer guess. While it may be said that there is not much choice between an informed wrong opinion and an uninformed guess, an expert opinion is still entitled to respect. Assuming that the expert witness is qualified in his field, his opinion at least is founded on an awareness of the factors entering into the estimate. An uninformed guess, to the contrary, is simply a shot in the dark—nothing more. There is more chance for a trained rifleman to hit the target of truth than one who simply closes his eyes and pulls the trigger.

Commonwealth counsel cite *Avins v. Commonwealth,* 379 Pa. 202, in contending for a new trial. In the *Avins* case a new trial was ordered because, as this Court recorded it, the Trial Judge said—"that he rejected the opinions of the experts and, having himself viewed the premises, applied instead 'good, sound, common horse sense.'" Our Court properly held that: "A jury may not disregard the evidence as to property values in a condemnation proceeding and substitute its own ideas . . . And, what a jury thus may not do, a court as the fact-finder without a jury likewise may not do. . . Likewise here, the common sense exercised by the court should have been in the appraisal of the testimony; it should have looked for any possible enlightenment touching the elements to be taken into consideration in determining the fair market value of the property and the reasonableness or unreasonableness of the opinions of the expert witnesses."

The difference between the *Avins* case and the case at bar is obvious: There, the Trial Judge completely

ignored the experts' testimony, here the Trial Judge asked the jury to apply—*"the standards used by the experts,* and determine what an honest and just and fair and reasonable amount would be." (Emphasis supplied)

In the case of *Leaf v. Pennsylvania Co.,* 268 Pa. 579, this Court affirmed a charge in which the Trial Judge said: " 'When it comes to the question of damages, in a case of this kind, you should use above everything else your good common sense, your horse sense, if I may use that term.' "

In the present case the Trial Judge also called upon the jury several times to use "horse sense." It is suggested, in the absence of any showing that an equine evaluation of real estate values is of particular merit, that such phrase be omitted from future charges, especially in view of the fact that the birth rate of horses in recent years has been declining so steadily that there is danger that within the foreseeable future jurors will have no knowledge of horses.

Commonwealth's counsel complains in their brief that "The learned Court erred in disparaging the evidence of the price paid by plaintiff, six months prior to the condemnation." It is not apparent from a reading of the record that there was any such disparagement. The Court allowed evidence of the purchase price; in fact, the deed showing the consideration was introduced as an exhibit and the Commonwealth real estate experts commented on the purchase price. The Trial Judge at one part of the proceedings did say: "Here is a development with 17 homes sold. It is an improper question to ask what the original cost was. If they had proposed plans and nothing done, that would have been different. It is for the jury." But it is not evident that the remark could have influenced the jury against the Commonwealth because two of its expert witnesses testified that the plaintiff's property

was worth $464,500 and $400,000 at the time of the taking, as against the purchase price which was $82,-940.40.

In their brief, Commonwealth counsel enumerate seven alleged trial errors, none of which would justify a new trial. For instance, it is complained that the Commonwealth was not allowed to cross-examine a witness, Andrew Shuty, as to why he failed to testify to certain matters before the Board of Viewers. Since all proceedings in the Court of Common Pleas are *de novo,* it is not clear what possible help it would be to a jury in that Court to find out what a witness before the Board of Viewers did *not* say.

It is also lamented by the Commonwealth that a witness was asked the same question four different times. Since the question was asked twice by plaintiff's counsel and twice by defendant's counsel, we do not feel that any new trial could effect a more equitable ratio of volubility.

Nor do we see any reason for ordering a new trial so that the Commonwealth may ask an expert witness to testify to the Zoning Ordinance of McCandless Township. The Commonwealth could have introduced the ordinance itself at the trial if it was really concerned about the matter, which we doubt that it was.

Finally, the Commonwealth wants a new trial for a reason which, of course, embraces all the other reasons, that is, an asserted excessive verdict. An analysis of the testimony fails to give substantiation to the appellant's alarm as to excessive compensation. In addition to outrightly losing 35 building lots (averaging in size 75 x 140 feet), the plaintiff expended some $18,000 for fills to relocate streets and rehabilitate building lots affected by the condemnation. The plaintiff company also made an outlay of $11,609.89 to relocate and install additional sewer lines to serve the

changed plan of lots. It was required to redesign and re-engineer its entire layout and make other changes because of the non-access highway cutting through the heart of its holdings. What we said in *Fisher v. Allegheny County*, 324 Pa. 471, could well apply here: "Just how substantial the total damage done plaintiffs was in terms of dollars and cents the jury which tried this case was in the best position to judge. The issue was submitted with proper instructions and the jury evidently endeavored to reach a just verdict. There is nothing in this record which would warrant us in declaring that the verdict was so clearly excessive that a new trial should be had to correct it."

The Commonwealth here appealed from the Board of Viewers' award of $20,000 to the Court of Common Pleas where it was set back with a verdict of $57,700. There is no assurance that another venture into the assizes may not result in an even heavier reverse. We are satisfied from a reading of the record that the lower Court was justified in concluding, based on the jury's findings, that $47,800 represents fair and just compensation for the property taken by the Commonwealth. The plaintiff is satisfied with that amount and the Commonwealth should not be content to pay less than what the facts, fortified by the law in the matter, prove to be just and fair compensation.

Judgment affirmed.

Mr. Justice COHEN took no part in the consideration or decision of this case.

———

DISSENTING OPINION BY MR. CHIEF JUSTICE JONES:

I would reverse the judgment and would order a new trial because of the errors, appearing of record, so egregious as to be unsusceptible of eradication by the trial judge's related caution to the jury or of correction

of the manifestly excessive verdict by the court *en banc's* order of remittitur.

However, since this court is affirming the judgment, no useful purpose would be served by my now detailing the reasons, which appear to me to be overwhelming, why the jury's verdict should have been rejected by the trial court without further ado and why the remittitur ordered by the court below failed to rectify the serious injustice done the Commonwealth. The appropriation of private property for public use through an exercise of the power of eminent domain is indeed "most awesome", not only for the condemnee but for the condemnor as well. Both are entitled to scrupulous fairness in the determination of the damages entailed. Such, however, is not the standard of treatment accorded the Commonwealth in this case, as I see it.

Mr. Justice BENJAMIN R. JONES joins in this dissent.